**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>**NICKLAS ASSOCIATES, INC.**</td><td>*</td><td></td></tr>
<tr><td>**D/B/A THE BOSS GROUP**</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>**Plaintiff,**</td><td>*</td><td></td></tr>
<tr><td>**v.**</td><td></td><td>**Case No.: GJH-14-3777**</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>**DONNA ZIMET,** *et al.*</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>**Defendants.**</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

*   *   *   *   *   *   *   *   *   *   *   *   *

**MEMORANDUM OPINION**

Plaintiff, a staffing company, alleges that one of its former employees is violating her non-compete agreement by working for one of Plaintiff's competitors within one mile of her former office. *See* ECF No. 4-1. This Memorandum Opinion and the accompanying Order address Plaintiff Nicklas Association, Inc.'s Motion for Temporary Restraining Order ("TRO") against Defendants Donna Zimet and her new employer, Atrium Staffing, LLC. ECF No. 4. A hearing was held on December 5, 2014. *See* Local Rule 105.6. For the reasons explained below, Plaintiff's motion is DENIED. The parties shall meet and confer to devise a schedule for expedited discovery on Plaintiff's still pending Motion for Preliminary Injunction.

## II.    BACKGROUND

According to Conor Smith, president of Nicklas Associates, Inc., Nicklas Associates, Inc. is a subsidiary of BLR Holdings, Inc. and does business as "the Boss Group." ECF No. 4-2 at ¶ 3. The Boss Group was founded in 1988 and is a staffing company that specializes in interactive, creative, and marketing personnel. *Id.* Essentially, Plaintiff represented to the Court, the Boss

Group brings together employers who need creative employees (employees with artistic and design skills) with individuals who have creative skills. To be competitive, the Boss Group maintains customer/talent files, manuals, and other written records. *Id.* at ¶ 4. It has also created an in-house software, Shangri La, which serves as a client database containing information regarding clients and potential prospects. *Id.* at ¶ 5. The Boss Group considers this program and information to be its lifeblood, to have independent value to its competitors, and to be confidential. *Id.*

Defendant Donna Zimet began working for the Boss Group on November 7, 2011 as a selling branch manager at its Iselin, New Jersey office. *Id.* at ¶ 8. In December 2013, Zimet moved into the role of account manager. *Id.* Her responsibilities included "new business development, building and maintaining quality relationships with clients, managing accounts and assignments, and growing existing accounts." *Id.* As a condition of employment, Zimet entered into an agreement prohibiting, upon termination of employment, certain competitive conduct, disclosure of confidential information, and solicitation of the Boss Group's clients. *Id.* at ¶¶ 9, 11. Specifically with regard to non-competition, Zimet agreed:

> that during the term of this Agreement, and for a period of twelve (12) months after the later of (x) the date of the conclusion of my employment with the Company for any reason, or (y) the date a court of competent jurisdiction enters an order enforcing this provision, I will not directly or indirectly, whether as a member, partner, shareholder, director, proprietor, officer, manager, employee, consultant, independent contractor, or otherwise compete with the Company, by engaging in the Business anywhere within a fifty (50) mile radius of any office in which the Company does Business that (i) I work at; (ii) I manage; or (iii) where I have client and/or talent relationships with in connection with my work on behalf of the Company. Nothing in this paragraph shall be construed to limit or restrict my ability to engage in the business of brokering independent consultants and placing temporary and permanent hires in fields outside of the Business of the Company after my employment with the Company concludes for any reason.

ECF No. 1-1 at 4. The "Business" is defined as "placing temporary workers and permanent hires in the fields of creative, marketing, communications, marketing and web, including but not limited to, art directors, copywriters, desktop publishers, editors, graphic designers, illustrators, interactive designers, marketing managers, marketing specialists, media buyers, medical copywriters, medical editors, medical proofreaders, multimedia experts, pre-press experts, production managers, proofreaders, user interface designers, web content specialists, web designers, web developers, web masters, writers, etc." *Id.* at 1. With regard to non-solicitation, Zimet agreed:

> that during the term of this Agreement, and for a period of twelve (12) months after the later of (x) the date of the conclusion of my employment with the Company for any reason, or (y) the date a court of competent jurisdiction enters an order enforcing this provision, I will not, (i) for my own account or (ii) on behalf of any person or entity other than the Company (a) directly or indirectly sell, provide or solicit the services (that are the kind or type with the Company sold, offered or provided) to a customer or client, prospective customer or prospective client, talent or prospective talent of the Company; (b) directly or indirectly cause any person or entity to cancel or terminate any business relationship with the Company, or (c) directly or indirectly interfere with any business relationship of the Company. For purposes of this Agreement the terms "customer" or "client"; "prospective customer" or "prospective client"; and "talent" and "prospective talent" are defined above in Section A 1 of this Agreement and the definitions of those terms are incorporated by reference herein as well, rather than being repeated.

*Id.* at 4–5. Finally, as to confidentiality, Zimet acknowledged:

> that the "Confidential Information" which the Company wants to protect is broadly defined. Specifically, "Confidential Information" shall mean the confidential information provided to me by the Company (or which I otherwise have access to), including without limitation, information regarding the Company or any of its business affiliates, customers or clients, customer, or client lists, prospective customers or clients, and its prospective talent or talent, candidates or prospective candidates, consultants and potential consultants, internal staff, including their respective names, identities, and addresses, list of workers, referral lists, and information regarding testing, screening, evaluation and recruiting processes, costs, prices, business strategies and plans, sales strategies, marketing methods, business means, ideas, reports, studies, financial information, earnings,

projections, financial data, means and methods, systems, operating procedures, web-based services, products or processes, computer programs and software, worked products, copyrights, trademarks, patents, licensees, trade secrets, technical data, software know-how, technology with respect to business and existing and future products and services, and confidential information provided to me by prospective and executed contracts and other business arrangements, and sources of supply, except to the extent that any such information is otherwise lawfully available to the general public.

*Id.* at 2–3.

Zimet resigned from the Boss Group effective July 11, 2014 and did not indicate where she would work next. ECF No. 4-2 at ¶ 15. The Boss Group sent Zimet a letter to remind her of her obligations of non-competition, confidentiality, and non-solicitation. *Id.* at ¶16. According to the Boss Group's president, in August 2014, it learned that Zimet was working for Defendant Atrium Staffing, LLC ("Atrium"). *Id.* at ¶¶ 17, 19. Atrium is a direct competitor of the Boss Group. *Id.* The Boss Group believes that Zimet is working at an office a few blocks from her former office. *Id.* Atrium has told the Boss Group that Zimet is working approximately 25 miles from her former office (which is still less than the 50 miles the non-compete agreement contemplates). *Id.* at ¶ 24.

The Boss Group believes that Zimet is working for Atrium in the same sector as she was for the Boss Group. *Id.* at ¶ 19. This belief stems from Zimet's Linked In profile and two emails that were inadvertently sent to Zimet's Boss Group email address. Zimet's Linked In profile notes that she is a "creative recruiter." *Id.* at ¶ 20. As for the emails, one email was from Dennis Nobel, who had been a Boss Group employee in the past, and was an individual with creative skills who sought Atrium's help to be placed with an employer. *Id.* at 19. In the email, he was confirming that he and Zimet had spoken regarding potential placement and recruitment opportunities. *Id.* at 19. In another email, Andrea Kozakewich, the representative of a business

looking for potential employees, sent Zimet a signed Atrium contract for placements. *Id.* at ¶ 28. Zimet had previously pursued Kozakewich as a potential client for the Boss Group.  *Id.*

After receiving the first email, the Boss Group sent Zimet a cease and desist letter and negotiated with Atrium and its attorney. *Id.* at ¶¶ 21, 23. Atrium told the Boss Group that Zimet was not employed in a sales capacity, she would not work with known Boss Group clients, and she was working approximately 25 miles from the closest Boss Group office. *Id.* at ¶ 24. Defendants represented to the Court at the hearing that Zimet was working on the sales side for the Boss Group (where she was reaching out to companies that were looking to employ individuals with creative skills), and is working on the recruiting side for Atrium (where she is reaching out to individuals with creative skills who will be placed with the employers). The Boss Group believes that, even if this is true, Zimet is still in violation of the non-compete agreement because she is working in the marketing and creative practice group within 50 miles of her former office. ECF No. 4-1 at 8–9.

On December 3, 2014, the Boss Group filed its lawsuit, submitting a verified complaint, alleging breach of contract against Zimet and tortious interference with a contract against Atrium. ECF No. 1. The following day, the Boss Group filed a temporary restraining order and motion for a preliminary injunction. ECF No. 4. This Court held a hearing on December 5, 2014, and Defendant filed an opposition brief on December 8, 2014. *See* ECF No. 9.

## II. STANDARD OF REVIEW

Plaintiff seeks a TRO, pursuant to Fed.R.Civ.P. 65(b), and a preliminary injunction, pursuant to Fed.R.Civ.P. 65(a), to restrain Zimet from engaging in the business of placing temporary workers and permanent hires in the fields of creative, marketing, communications, marketing and web, within 50 miles of Plaintiff's office in Iselin, New Jersey. *See* ECF No. 4-3.

Plaintiff also wishes to restrain Zimet from soliciting its customers. *Id.* Finally, Plaintiff seeks an order enjoining Atrium from encouraging, assisting, or supporting Zimet in violating her non-compete agreement. *Id.*

The purpose of a TRO or a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). The substantive requirements for a TRO and a preliminary injunction are identical. *See U.S. Dept. of Labor v. Wolf Run Mining Co., Inc.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006). The grant of a TRO or a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Dewhurst v. Cnty. Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (*quoting Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008)) (internal quotation marks omitted). Thus, the burden placed upon Plaintiff to state a claim for a TRO is high. The Supreme Court and the Fourth Circuit recognize four requirements that a party must show to be granted a TRO or preliminary injunction:

> (1) there is a likelihood of success on the merits; (2) there is a likelihood the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in movant's favor; and (4) the injunction is in the public interest.

*The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009) (*citing Winter*, 555 U.S. at 20); *see also Dewhurst*, 649 F.3d at 290 (reaffirming the four requirements). All four of these requirements must be met in order for a TRO to be granted. *See Dewhurst*, 649 F.3d at 290.

6

### III.    DISCUSSION

Because Plaintiff must satisfy all four requirements to obtain a TRO, the Court will focus on the alleged irreparable harm as the shortcomings in Plaintiff's argument here are clear and thus resolve the issue.  Generally, "irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (*citing Danielson v. Local 275,* 479 F.2d 1033, 1037 (2d Cir. 1973)). Thus, "when 'the record indicates that [plaintiff's loss] is a matter of simple mathematic calculation,' a plaintiff fails to establish irreparable injury for preliminary injunction purposes." *Multi-Channel TV Cable Co.*, 22 F.3d at 551-52 (quoting *Graham v. Triangle Pub.,* 344 F.2d 775, 776 (3d Cir. 1965)). "[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Multi-Channel TV Cable Co.*, 22 F.3d at 552; *see also Merrill Lynch, Pierce, Fenner and Smith v. Bradley,* 756 F.2d 1048, 1055 (4th Cir. 1985). However, the irreparable harm to the plaintiff "must be neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 812 (4th Cir. 1991).

Here, Plaintiff has not sufficiently demonstrated that failure to grant a temporary restraining order preventing Zimet from working in the creative department at Atrium will likely create the possibility of permanent loss of customers or loss of goodwill. In fact, time has suggested otherwise. Plaintiff first learned that Zimet was working for Atrium in August 2014. ECF No. 4-2 at ¶¶ 17, 19. Four months have passed since Plaintiff learned of the employment, and Plaintiff is not able to identify a single incident where Zimet's employment caused Plaintiff to lose a customer to Atrium. Plaintiff's attempts to show harm are unavailing.  In one instance,

Plaintiff claims that Zimet "had spoken and counseled [a former Boss Group employee] regarding potential placement and recruitment opportunities," ECF No. 4-1 at 6, but does not claim that the relationship between the Boss Group and this employee ended because of that contact.  In another instance, Plaintiff alleges that it became aware of a contract between Atrium and Andrea Kozakewich and that Kozakewich was previously a prospective customer of Plaintiff whom Zimet had solicited for Plaintiff.  *Id.* at 8.  Notably, however, at the hearing, Defendants alleged that Kozakewich was never an actual customer of Plaintiff and indeed had already rejected Plaintiff's services before Zimet left their employment.  Although Plaintiff was given an opportunity to do so, it has not refuted that assertion.  Thus, despite the passage of four months and clear indications that they have been monitoring Zimet's activity, Plaintiff can point to no evidence of harm nor have they established that their claim of future irreparable harm rises above being merely "remote or speculative." *Cf. Southtech Orthopedics, Inc. v. Dingus*, 428 F.Supp. 2d 410, 418 (E.D.N.C. 2006) (finding, in case where former employee allegedly breached a non-compete agreement, plaintiff's evidence that sales were down in former employee's territory was insufficient to show irreparable harm would result from the lack of a preliminary injunction because plaintiff's evidence was speculative as sales could have been down for other reasons); *ForceX, Inc. v. Technology Fusion, LLC*, 2011 WL 2560110 at * 7 (E.D.Va. June 27, 2011) ("The very point of non-compete agreements, and the litigation that follows in the wake of a breach of a non-compete agreement are remedies to this harm.")

Given the finding that Plaintiff has failed to demonstrate the necessary showing of irreparable harm, the Court need not address the other three considerations of likelihood of success on the merits, the balance of equities, and the public interest. *See Dewhurst*, 649 F.3d at 290 (explaining that each of the four TRO requirements must be met for the Court to grant that

relief).[1]  While discovery could reveal otherwise, on the current record, Plaintiff has not met the high burden necessary to obtain the extraordinary relief of a temporary restraining order.

## VI.    CONCLUSION

Accordingly, for the aforementioned reasons, Plaintiff's Motion for Temporary Restraining Order, ECF No. 4, is DENIED.  The parties SHALL meet and confer for the purpose of establishing a schedule for expedited discovery which would permit the parties to appear before the Court for an evidentiary hearing on Plaintiff's Motion for Preliminary Injunction no more than 40 days from the date of the accompanying Order. A status report SHALL be submitted by Plaintiff's counsel within two days of this order either informing the Court of the agreed upon schedule or providing the Court with two competing proposals from which the Court will decide.


Dated: <u>December  9, 2014</u>                        <u>        /S/                </u>
                                                            George Jarrod Hazel
                                                            United States District Judge

---

[1] As to the likelihood of success on the merits, the question of whether there has been a breach of an enforceable provision of the non-compete agreement is, in the Court's view, a close issue.  On the current record, the Court would not be able to side with Plaintiff on this element either, however, both this issue, and the matter of irreparable harm would benefit from expedited discovery and an evidentiary hearing on Plaintiff's Motion for Preliminary Injunction.